UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


UNITED STATES OF AMERICA,            )
                                     ) Cause No.
          Plaintiff,                 ) 1:19-cr-0152-TWP-MJD-01
                                     ) Indianapolis, Indiana
     vs.                             ) **January 6, 2023**
                                     ) 9:10 a.m.
ROBERT MASON ELLIOTT,                )
                                     )
          Defendant.                 )


**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
SENTENCING


**For Plaintiff:**                   Tiffany Jacqueline Preston, Esq.
                                     Kristina M. Korobov, Esq.
                                     Assistant U.S. Attorneys
                                     United States Attorney's Office
                                     Suite 2100
                                     10 West Market Street
                                     Indianapolis, IN  46204


**For Defendant:**                   Brandon Sample, Esq.
                                     Brandon Sample PLC
                                     P.O. Box 250
                                     Rutland, VT  05702




Court Reporter:                      David W. Moxley, RMR, CRR, CMRS
                                     United States District Court
                                     46 East Ohio Street, Room 340
                                     Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

(In open court.)

THE COURT:  Good morning, everyone.  We are on the record.  This is the United States of America versus Robert Elliott, our case number is 1:19-cr-152, and we are here this morning for a sentencing hearing.

We will begin by having counsel state your name for the record and introduce those at your table, beginning with the government.

MS. PRESTON:  Good morning, Your Honor.  Tiffany Preston on behalf of the United States.  Here with me today is Kristina Korobov from the United States Attorney's Office and Special Agent Andrew Willmann from the FBI.

THE COURT:  Okay.  Good morning.

MS. KOROBOV:  Good morning.

MR. WILLMANN:  Good morning.

THE COURT:  And at our defendant's table?

MR. SAMPLE:  Good morning, Your Honor.  Brandon Sample for Robert Mason Elliott.  And here with me, and present, is Mr. Robert Mason Elliott.

THE COURT:  Good morning.

For the record, from the United States Probation Office, Latasha Cowart is present; and our court reporter today is David Moxley.

When we were last in court, parties, the defendant, Robert Elliott, entered a plea of guilty to Counts 1 and 2,

murder for hire; Counts 3 and 4, tampering with a witness, victim, or informant; and, also, Count 15, felon in possession of a firearm. It was the finding of the Court that the defendant was fully competent and capable of entering an informed plea, that he was aware of the nature of the charges and the consequences of the plea. The Court found that the plea of guilty was knowing and voluntary, it was supported by an independent basis in fact containing each of the essential elements of the five offenses.

The plea was accepted and the defendant was adjudged guilty of Counts 1 and 2, murder for hire; Counts 3 and 4, tampering with a witness, victim, or informant; and, Count 15, felon in possession of a firearm, and we are here this morning for the sentencing hearing.

Has the government had an opportunity to review the Presentence Investigation Report that's at docket 252, that was just recently filed?

MS. PRESTON: Yes, Your Honor, I have.

THE COURT: And do you have any objections or corrections to that report?

MS. PRESTON: No, Your Honor.

THE COURT: Thank you.

Mr. Sample, have you and your client had an opportunity to review the Presentence Investigation Report at docket 242, as well as the report that was just recently

docketed at 252?

MR. SAMPLE:  Yes, Your Honor, we have.

THE COURT:  And it's my understanding that the only changes in the report at 252 are with respect to the objections; is that correct?

MR. SAMPLE:  That is correct, Your Honor.

THE COURT:  It's the Court's understanding that with respect to paragraphs 107, 114, 121, and 28, the United States has withdrawn its position of vulnerable victim, and the government does reserve the right to argue that the victim was vulnerable under 3553(a); correct?

MS. PRESTON:  That's correct, Your Honor.

THE COURT:  And so this resolves the defendant's objections one, four, five, six, and seven.

It's my understanding that as to paragraph 96, the United States concedes the distribution to a minor pursuant to guideline 2G2.2(b)(3)(C) applies, resulting in a five-level enhancement rather than the six-level enhancement; am I correct?

MS. PRESTON:  Yes, Your Honor.

THE COURT:  So this resolves the defendant's objection number two.

Paragraph 99, Mr. Sample, it's my understanding that Mr. Elliott withdraws objection number three as to the number of images; am I correct?

1    MR. SAMPLE:  That's correct, Your Honor, in light of

2    the guideline language.

3    THE COURT:  And with respect to paragraphs 139 through

4    144, Mr. Elliott agrees with the resolution and the probation

5    officer's response as to grouping and the multiple-count

6    adjustment, and so you are withdrawing any further objection to

7    the grouping of those counts; is that correct?

8    MR. SAMPLE:  That is correct, as well, Your Honor.

9    THE COURT:  And this resolves defendant's objection

10   number eight.  And so these are all of the -- this is the

11   difference between the two reports; do you agree?

12   MR. SAMPLE:  I do agree, Your Honor.

13   THE COURT:  And do you agree?

14   MS. PRESTON:  I do, Your Honor.

15   THE COURT:  Okay.  All right.  So, Mr. Sample, do you

16   have any other objections or corrections that need to be made

17   to the Presentence Investigation Report?

18   MR. SAMPLE:  I do not -- I do not, Your Honor.  I will

19   note for the record that this morning Mr. Elliott has signed

20   the Presentence cover sheet report, and we're prepared to offer

21   that, at the conclusion of the hearing, back to Probation.

22   THE COURT:  Thank you very much.

23   The Court is going to accept the Presentence

24   Investigation Report for the record under seal.  In the event

25   of appeal, counsel on appeal will have access to the report,

but not the recommendation portion, which shall remain confidential.

Based upon the sentencing guidelines, the Court finds that the base offense level for Count 1, murder for hire, is level 37. The base offense level was 33, but there's a four-level increase because the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder.

The adjustment for obstruction of justice applies because the defendant obstructed, impeded, or attempted to obstruct, impede the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct. Therefore, there's a two-level increase, and the adjusted offense level for Count 1 is level 39.

Count 2, murder for hire, the base offense level is also 37. The four-level increase is there because this offense also involved the offer or receipt of anything of pecuniary value for undertaking the murder. The adjustment for obstruction of justice applies because the defendant did willfully obstruct, impede, or attempt to obstruct and impede the administration of justice with respect to the investigation, prosecution, and sentencing of this offense, so there's a two-level increase. The adjusted offense level

subtotal for Count 2 is level 39.

With respect to Count 3, tampering with a witness, the base offense level is 33. For the specific offense characteristic that the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, there is a four-level increase.

The adjustment for obstruction of justice applies on this count, also, so there's a two-level increase because the defendant willfully obstructed, impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of this offense. The adjusted offense level subtotal for Count 3 is level 39.

Count 4, tampering with a witness, the base offense level is 33. For the specific offense characteristic that the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, there's a four-level increase. The adjustment for obstruction of justice applies so there's a two-level increase, and the adjusted offense level subtotal for Count 4 is 39.

Count 5, production of child pornography, and Counts 10 through 14, distribution of child pornography, all group, and the base offense level for these violations is 22. For the specific offense characteristic that these offenses involved distribution to a minor, there's a five-level increase. For the specific offense characteristic that the

defendant engaged in a pattern of activity involving sexual abuse or exploitation of a minor, there's a five-level increase. For the specific offense characteristic that the offense involved the use of a computer, there's a two-level increase. For the specific offense characteristic that the offense involved at least 300 images, but fewer than 600, there's a four-level increase.

The adjustment for obstruction of justice applies because the defendant willfully obstructed, impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of this offense, so there's a two-level increase. The adjusted offense level subtotal for Counts 5, 10, 11, 12, 13, and 14 is 40, level 40. Oh, I'm sorry. That's just for level -- that's just for Count 5? Because Count 6, production of child pornography -- oh, I'm correct. Counts 5, 10, 11, 12, 13, and 14.

Count 6, production of child pornography, the base offense level is 32. For the specific offense characteristic that this offense involved the commission of a sexual act or sexual contact, there's a two-level increase. For the specific offense characteristic that the defendant knowingly engaged in distribution, there's a two-level increase. The adjustment for obstruction of justice applies, so there's a two-level increase, and the adjusted offense level subtotal for Count 6

is 38.

Count 7, production of child pornography, the base offense level is level 32. For the specific offense characteristic that the offense involved the commission of a sexual act or sexual contact, there's a two-level increase. For the specific offense characteristic that the defendant knowingly engaged in distribution of the child pornography, there's a two-level increase. The adjustment for obstruction of justice applies to this count, so there's a two-level increase. The adjusted offense level subtotal for Count 7 is level 38.

Count 8, production of child pornography, the base offense level is 32. For the specific offense characteristic that the offense involved the commission of a sexual act or sexual contact, there's a two-level increase. For the specific offense characteristic that the defendant knowingly engaged in distribution, there's a two-level increase. The adjustment for obstruction of justice applies, so there's a two-level increase, and the adjusted offense level subtotal for Count 8 is level 38.

Count 9, production of child pornography, the base offense level is 32. For the specific offense characteristic that the offense involved the commission of a sexual act or sexual contact, there's a two-level increase. For the specific offense characteristic that the defendant knowingly engaged in

distribution, there's a two-level increase.  The adjustment for
obstruction of justice applies, so there's a two-level
increase.  The adjusted offense level subtotal for Count 9 is
level 38.

Count 15, felon in possession of a firearm, the base
offense level is 20 because the offense involved a
semiautomatic firearm that's capable of accepting a
large-capacity magazine, and the defendant was a prohibited
person at the time that he committed this offense, so the
offense level is 20.  For the specific offense characteristic
that the offense involved between three and seven firearms,
there's a two-level increase.  For the specific offense
characteristic that the firearm had an altered serial number,
there's a four-level increase.  The adjusted offense level
subtotal for Count 15 is level 26.

Under the grouping and multiple-count adjustment, the
total number of units is five.  The greater of the adjusted
offense levels is level 40.  Because of the number of units,
the five units result in an increase of four levels.  The
combined adjusted offense level is level 44.  However, the
highest in our -- so he's 44.

The defendant has accepted responsibility so he is
entitled to the two-level reduction, because he did plead
guilty.  And, Government, do you have a motion with respect to
the additional one level?

MS. PRESTON:  We ask for that one level now, Your Honor.

THE COURT:  That motion is granted because you have saved the time and expense of a trial.  You get the full three-level reduction, Mr. Elliott, so your total offense level is level 41.

Okay. the defendant does have a criminal history that warrants criminal history points.  We will begin with his February 12th, 2013, conviction for felony theft and felony obstruction of justice in the Shelby Circuit Court, and that conviction is three criminal history points.

The defendant was convicted on September 4th, 2012, of criminal mischief in the Shelby Superior Court.  That conviction is one criminal history point.

The defendant was convicted on February 13th -- February 12th, 2013, of felony obstruction of justice in the Shelby Circuit Court.  That conviction is three criminal history points.

The defendant was convicted July 21st, 2016, of felony intimidation, threat to commit a forceable felony in the Shelby Circuit Court, and that conviction is two criminal history points.

The defendant was convicted June 15, 2016, of invasion of privacy in the Shelby Superior Court.  That conviction is two criminal history points.

The defendant was convicted on July 21st, 2016, of battery in the Shelby Circuit Court.  That conviction is two criminal history points.

The defendant was convicted on May 5th, 2016, of intimidation in the Hendricks Superior Court.  That conviction is one criminal history point.

Mr. Elliott was convicted January 5th, 2016, of invasion of privacy in the Marion Superior Court.  That conviction is one criminal history point.

The defendant was convicted June 15, 2016, of invasion of privacy in the Shelby Superior Court.  That conviction is two criminal history points.

The criminal convictions result in a subtotal criminal history score of 17.  Because the defendant was still on parole, probation, or community corrections in Shelby County and Marion County when he committed these offenses, two points are added.  The total criminal history score is 19.  A score of 19 establishes a criminal history category VI.  And under the sentencing guidelines, the advisory sentencing range is 360 up to 1,080 months, which is a range of 30 to 90 years' imprisonment.

However, the binding plea agreement calls for a sentence of between 10 and 55 years.  And the Court is going to accept the binding plea agreement terms, so the Court will sentence within the range of 10 up to 55 years' imprisonment.

And so at this time, before we get to argument, are there -- does either party have any witnesses that they wish to present?  Government, are you going to present any witnesses?

MS. PRESTON:  Your Honor, no witnesses.  However, Minor Victim 1 and Witness Victim 1 are here and present and would like me to read into the record their victim impact statements.

THE COURT:  You may do that.  Why don't you come up to the lectern.  And, Ms. Preston, you know to read slowly for the court reporter.

MS. PRESTON:  Yes, Your Honor.

Your Honor, I begin for the record by reading the statement of Witness Victim 1, who is Minor Victim 1's mother.  She is here, present, in the witness room.

She begins by saying:  He, Mason, Robert Elliott, did the following.  He used my daughter, Minor Victim 1, as a punching bag.  He did sexual things to Minor Victim 1 and allowed sexual things to happen to Minor Victim 1 that should not ever have happened.  And then he would try to twist it to her, thinking it was all her fault.  Manipulator.

He allowed Minor Victim 1 to drink and party on a regular basis.  His mother, Debbie, would drop Minor Victim 1 off in the driveway.  It was so bad, I heard sounds, opened the door, and physically caught Minor Victim 1 to keep her from falling backwards off the porch.  She did not know who I was or

1 where she was, so I rushed her to the hospital.

2 He allowed Minor Victim 1 to drink and drive. He

3 would abandon Minor Victim 1 when he didn't get his way and

4 got upset in random places, and I would have to go get her. He

5 would sneak to my house while I was at work or even while I was

6 sleeping.

7 It caused physical, mental, emotional damage to Minor

8 Victim 1. It caused Minor Victim 1 to be self-conscious

9 about herself, not trust her own decisions or trust others,

10 including me as her own mother. The pain that caused was

11 awful. It caused serious issues between Minor Victim 1 and I,

12 trust, respect, et cetera, and it still does to this day over

13 certain things, triggers memories. It's hard.

14 But Minor Victim 1 is beautiful, a beautiful woman,

15 and has grown so much through all of this pain. She has taught

16 me to be a better woman, mother, grandmother, friend, human

17 being, et cetera.

18 He has caused us watching over our backs everywhere we

19 go and with everything we do all the time. He has caused loss

20 of work activities -- sorry, loss of work, activities, living

21 our lives the way we want and should be.

22 What I want from this is: The manipulating scum needs

23 to rot for all of the awful pain and suffering he has caused

24 to Minor Victim 1, my baby girl. Yes, Minor Victim 1 is an

25 adult now, but she was only 16 when this began. She was taken

advantage of, manipulated, used, and abused.  She has suffered long enough and never should have -- should have done any of that.

Today is the day that Mason (Robert Elliott) gets what he deserves for all of the pain he has caused, not to mention suffering.  He deserves the max sentence so that Minor Victim 1 can move on and live the safe, happy life she deserves. Thank you.

And, Your Honor, for the record, the statement uses Minor Victim 1's first name.  I simply replaced the first name with "Minor Victim 1."

Turning next for the record, Your Honor, to the statement written by Minor Victim 1 herself:

Robert Mason Elliott has attempted, and been successful in most instances, at making my life unlivable since I was 16 years old.  Before meeting Mason, my life was going in a very positive direction.  I was engaged in my schooling and my relationships with my peers and my family.  I could have been considered your average girl.  My life was not the easiest.  I experienced bullying and generational curses that most people may not have overcome.  I had dreams and hopes of being successful in all areas of my life.

Upon meeting Mason, a/k/a Robert, all of those hopes and dreams I had for myself slowly start to fade away.  When I met him, he was already on house arrest for something prior.  I

had never been in trouble before.  Our relationship started somewhat normal, or at least that's what I thought.  I had never been in one with an adult before.

I was attempting to help him recover from a surgery he had just had, so the beginning of our relationship was just that, me being a caregiver to him.  He had been prescribed Percocet because of said surgery, and that's when drugs were first introduced to me at the beginning of our relationship.

Upon a release from house arrest -- his release from house arrest, his behavior became almost instantaneously aggressive.  He introduced me to a new group of people, people whom he lied to about my age, because he knew it was wrong.  They started supplying him with cocaine.  And at the time, I had already been sharing Robert's Percocet with him.  I didn't have a full concept of addiction at the time, so I was not inclined to say no when it was offered to me by Robert.

Upon further use of the drug with Robert, I started declining in my schooling and my relationships.  I became reserved and hostile toward everyone in my life but him.  As our drug use became worse, so did his aggressive behavior.  The first time Robert hit me, he split my bottom lip almost completely through.  You can see the scar to this day.  After that instance of abuse, I feel as though he got a thrill out of hurting me.  He would boast to others, but deny the abuse to most.

The abuse continued along with the drug use. As the abuse got worse, so did the drugs we used. He progressed from cocaine -- it progressed from cocaine to heroin. I began using the drug after witnessing Robert do it that way. Not only was I being physically and emotionally abused, I was also being psychologically abused when it came to the drugs. If he and I were in a verbal or physical altercation, he would just use the drugs to escalate or deescalate a situation just because he could, because he was the one in control of them.

I feel that if Robert and I had not engaged in a relationship, that my life would have never went the way that it went. The physical and mental abuse continued through the duration of our relationship. There were multiple occasions in which Robert would cause traumatic physical abuse to my face and body. He would tell others that I deserved everything that he gave me. I think it made him feel powerful. For a while I thought maybe I did deserve the abuse. My life continued to deteriorate.

Upon receiving my first couple of legal charges myself, I began to realize the seriousness of the situation I was in. This is not the life I wanted to live. I was engulfed by addiction and fear. It was out of fear that I continued to stand by Mason and he continued to get into trouble legally. While supporting him, I was neglecting myself.

When Robert was placed on GPS monitoring, I thought

maybe it would be the end of everything, but it wasn't. We still found ways to interact with each other. I knew I had to do something to get away from him or I was going to end up in juvenile or a body bag. I had to start putting myself first.

I asked the courts to please help me because I was a heroin addict, and what they were doing with my case, legally, was not enough. I was almost successful the first time they put me on house arrest, but I still could not get away from Robert's influence. He would case my house and leave trinkets for me in my mailbox.

I was later arrested and sent to Johnson County Juvenile for possession of a hypodermic syringe because I would not tell them who supplied it to me. Throughout our relationship, I became used to the physical abuse, but the mental abuse became so bad that I attempted to take my own life, because nothing I did could get me away from Robert and his abuse. He made me feel such hatred toward myself that I actually attempted to take my own life.

While I was recovering from that, Robert sent messages every day promising changed behavior and sobriety. That never came. I was an impressionable child, and he knew all of the right things to say to get possession of me and my thoughts. It took years for me to come to terms with the fact that no matter how mature I was for my age, I was still just a child, a child who had pushed her family away so they didn't have to see

all the pain she was enduring, a child who had dropped out of school and stopped communicating with her friends because they didn't understand.

I was so influenced by Robert and the drugs that came with him. He manipulated me into believing he was all I needed. I was so alone, under his thumb, and at his mercy. My life had become completely unmanageable. Had my mother not done what she did to protect me, I would be dead. She tried so hard and for so long to get me away from him because she saw the change in me. I was unrecognizable, but I was still her baby. I feel if she did not act in the way that she did, Robert would have killed me in one way or another. To this day, he has not stopped trying, and I don't think he ever will.

When I finally got the help I needed for my drug addiction, I thought I was over the worst of it and that I was safe, because Robert was finally incarcerated for some of the things he had done to me. That was not the case. While I was at a residential treatment facility working on myself and learning to overcome my addiction and rebuild my relationships with my mother, I was informed that some detectives may be coming to speak to me because Robert and his mother had come up with a plan to kill my mother and I. I was in denial. Even with that knowledge, I still pushed through and successfully completed my treatment. Today I am 1,815 days sober from heroin, four years, 11 months, and 20 days since my last

administered IV use into my body.  I had broken my cycle of
addiction upon being removed completely off the presence of
Robert.

Since being away from all the things to do with him in
my almost five years of sobriety, I have graduated at the top
of my class as part of the Honor Society.  I have rebuilt the
relationships with my mother that were broken by drugs and
abuse.  I've become a mother myself and practiced gentle
parenting still, after everything I've been through.  I have
effectively broken a generational curse.  I maintain two jobs
and I am the sole provider for my daughter.

Still, after all of these amazing milestones in my
life, through all of them, I have had to worry about my family
and our safety.  Even with Robert in federal custody, I have
still had to protect myself from him and his family, as well,
because they justify and support him after everything they've
done to my family.  We have had to be in federal custody and
removed from our home and our life and our family because, yet
again, Robert tried to have my mother and I killed.

I have endured so much more than anyone will ever
truly understand.  The abuse that I've endured from Robert will
leave an everlasting negative effect on me, my life, and my
future relationships.  No amount of time he could ever receive
will make up for the things he put me through.  I will live
with this forever.  The things I've had to endure at his hands

will cause me to always live in fear, because even incarcerated, he is still trying to find a way around the law to hurt me, because he will never assume responsibility for what he has done.

For that, I ask that he receive the max sentence so I can continue to try to find some closure and peace in the fact that if he remains incarcerated, my family can remain protected. I feel if he is released, my life, my child's life, and my mother's life will be greatly at risk.

For the last six years, I've had to watch over my shoulder every time I go to the grocery store or take my daughter to the park, or even in the comfort of my own home. I don't think I'll ever be able to live my life to the full extent. I've always had to be aware of my surroundings, because Robert has blatantly disregarded my family's safety.

My family and I deserve justice. Six years is long enough to live in fear, but, unfortunately, my past will follow me forever, but my daughter doesn't deserve to have it haunt her, too. Thank you, Your Honor.

THE COURT: Thank you, Counsel.

MS. PRESTON: And, Your Honor, for the record, Minor Victim 1 is here, sitting to the left of Ms. Stephanie Lloyd, our victim witness coordinator.

THE COURT: Can you raise your hand, Minor Victim 1.

Okay. And where is Witness Victim 1, her mom?

1          MS. PRESTON:  She is in the back witness room, Your

2     Honor --

3          THE COURT:  She didn't --

4          MS. PRESTON:  -- watching over Minor Victim 1's

5     daughter.

6          THE COURT:  Okay.

7          MS. PRESTON:  Thank you very much, Your Honor.

8          THE COURT:  All right.  No other evidence, Government?

9          MS. PRESTON:  No, Your Honor.

10          THE COURT:  Do you have any evidence to present,

11     Counsel, or just argument?

12          MR. SAMPLE:  Just argument, Your Honor, other than

13     what we've already submitted to the Court.

14          THE COURT:  Okay.  All right.  So, Mr. Sample, you may

15     present your argument.

16          And, Mr. Elliott, you're allowed to make what we call

17     a statement of allocution, which means you can say whatever you

18     would like to say on your behalf.

19          And how will you proceed, Counsel?

20        (Off the record.)

21          MR. SAMPLE:  Your Honor, I think my client is going to

22     give his allocution first.

23          THE COURT:  Okay.  You may.  And you can do that from

24     right there where you're seated, sir.  And I need you to -- if

25     you're reading, read very slowly so the court reporter can get

it down; okay?

THE DEFENDANT:  I would like to first thank the Court and the prosecution for giving me this time and the opportunity to address this Court.  When I first started putting some thought into what I wanted to say at this hearing, I had no intention of writing that allocution on paper because I wanted to be able to speak from the heart and not have to read from a piece of paper, but as I continued to take notes and plan for this today, it quickly became apparent that I would not be able to remember everything that I wanted to say and cover.  So please forgive me if this takes a few minutes to read.  I will try to keep this as brief as possible.

I would like to take this time to reflect on my past actions and my past failures that have landed me here today, as well as address this Court and the victims of my crimes, and express my remorse and regret for the pain and life-changing traumas that I put them through.

But, first, I would like to start with the root cause of why we're all gathered here today, me, me and my traumatic childhood experiences that have made me who I am today.  Please forgive me if this takes some time to read.  A lot of these times in my life are difficult to speak about.

I can't sit here today and say that I had a normal or even a good childhood in any way, because I didn't.  I struggled with mental health illnesses for as long as I can

remember, dating back to one or two years old.  The earliest
memories that I can recall as a child, when I first started to
realize there was something wrong with me, was when I was about
two years old.  I had very bad Tourette's and ADHD, and I
recall kneeling in the driveway, on my hands and knees, and
slamming my head repeatedly on the concrete driveway until my
mom ran outside and picked me up and brought me inside to clean
the blood off of me.

Sometime soon after that, I remember meeting with who
I think would be my first counselor or therapist that I would
talk to.  I remember telling them that I didn't understand life
and was very sad and just wanted to die.  Still, to this day, I
don't know what was wrong with me or why I was the way that I
was.  Similar episodes of this nature continued on throughout
my early childhood.

My next memory from my childhood, that still burns in
my mind to this day, was when I was four years old.  My next --
my next door neighbor took me to a monster truck race and at
some point forced me to perform oral sex on him.  Over the
years as that happened -- happened to me, I've tried to block
out and bury as many of those disgusting memories and details
as deep as I can somewhere inside of me.  But, even with doing
that, I'm still haunted by those memories to this day.

I don't know why he did what he did to me, and I've
never seen him or spoke to him since, but I forgive him for

what he did to me.  I thought that by forgiving him, it would help me to be able to move forward in life and heal from that experience, but it didn't.  I guess some scars just never heal.

I think that experience had the heaviest impact on my outlook on counseling and opening up to anyone.  After I told my mom about this happening to me, and reluctantly told the police what he did to me, he was never arrested.  At some point in time shortly after this happened to me, I started talking to a counselor about what happened.  Clearly, it didn't help.  As a result of him not being arrested for what he did to me and the failed counseling attempt, I think that made me feel that opening up to anyone about my problems or things that have happened to me in life was a waste of time and that no one would believe anything that I said.

I believe that's what laid the foundational belief that would follow me for the rest of my early life, that my problems are mine and mine alone, and that I need to deal with them on my own rather than suffer more trauma by making myself more vulnerable and opening up to someone and seeking help just to be let down and feel that I am not believed.  That belief would unfortunately stick with me for the next two decades.

From that point moving forward in life, things didn't get any easier.  My memories of my childhood are very hit and miss as a result of me trying to force myself to forget those dark times.  My father was never a part of my life.  I was

raised by my mom and my grandparents.  I can only remember
maybe three times that I've seen my father.  My mother and my
father were never married.

My first and only childhood memory of my father was
when I was around three or four years old.  I remember my
mother allowed me to go to my father's house to spend the
night.  That night never ended up happening.  I remember asking
my father if I could go outside and ride my bike around the
block.  Me being the curious child that I was, I guess I
wandered much further than just around the block.  I actually
wandered about five or six blocks away from his house and was
spotted by my mother as she was driving through town.

My mother naturally stopped and picked me up and drove
me back to my father's house and walked me inside and began
talking to my father, who was passed out on the couch, drunk,
which I wouldn't come to learn until many years later.  But at
some point while my mom was talking to my father and asking him
why he wasn't keeping an eye on me while I was out riding my
bike, he became very loud and violent and started screaming at
my mom and started pushing her.

I remember him pushing her and her falling down and
hitting her head on the living room table while I was sitting
on the couch.  Once she got back up, I remember her telling me
to collect my things and that we were leaving.  I guess that
made my father even more mad, because he grabbed a frying pan

off of the stove and started beating my mom on the head and in the face with it, then, eventually, threw the pan at her, but hit me with it instead. I don't remember much after that except my mom grabbing me up and running me to the car and us speeding away.

That would be the last time that I would see my father until I was about 13 or 14. I still remember the blood on my mom's face that day and the bruises that I would have to look at on her face for the days to come, and then asking my mom if all mothers and fathers did this and why my father did this to us. Looking back on that day today, the answer is obvious.

As my childhood continued, so did my struggles. I was bounced around to four different elementary schools, not because of fights or being a troublemaker, but because back then I guess public schools didn't have much training or experience on how to deal with and teach children with learning disabilities or mental health problems. I was never able to learn at the rate that other children were, so I was almost immediately placed in special ed classes for my first day of school.

When you think of special ed classes, you would think that they would be better suited to teach children like me, but, clearly, they weren't. I'm not going to sit here and take up the Court's time with multiple years of special ed struggles and school transfers, but what ultimately humiliated me and

landed me my fourth and final transfer to what would be the
school that I would finally go on to finish my elementary years
of schooling at happened at Hendricks Elementary.

Apparently, my homeroom teacher became fed up with
trying to work past my learning disabilities and found my trust
to be such a problem that she decided to bring in an actual
cardboard refrigerator box and put it in the back corner of the
classroom and put my desk in it. I was made to sit inside of
that box every day of school until one day I told my mom that I
have to sit in a box every day when I go to school.

Needless to say, my mom was infuriated. I don't think
I ever went back to that school again after that. The
Department of Education ended up getting involved and took
action against the school and made them attend a class on how
to properly deal with and teach children with learning
disabilities and mental health problems so, hopefully, no child
will ever have to go through what I did.

I ultimately went on to graduate elementary school at
Coulston. At some point in time after graduating from
Coulston, I was put into home schooling at Penn Foster and
graduated at age 15 with a 3.8 GPA.

Moving forward to age 19, I enrolled at ITT Technical
Institute for electrical engineering. I continued my schooling
there until the campus unexpectedly closed. I then enrolled at
Kaplan College for electrical technician and continued there

until I was carjacked and pistol whipped to the point of
unconsciousness at a gas station.  As a result of that, I
stopped my schooling at Kaplan.  It seems that that is when my
most serious self-harm and suicide attempts began.

To be brief, I was committed to multiple different
inpatient mental health facilities multiple different times,
each time yielding more -- multiple different diagnoses.  In
hindsight, I don't think I ever received an accurate diagnosis
or any real treatment.  I was pretty much a guinea pig and
prescribed dozens of different psych meds on a trial-and-error
basis, each medication affecting me differently and changed me
as a whole.  This cycle of medication changes and inpatient
commitments would continue on until 2016.

I want to make it abundantly clear to this Court that
I am not using any of the things that have happened to me as a
child or all of the psych meds that I was experimented on with
in life as an excuse for what I did.  I did what I did because
I chose to do so.  It was not a lapse in judgment, it was not a
bad decision.  It was a total failure at being a decent person.

But I do believe that all of the things that I have
experienced in my life have been a major contributing factor to
my mental health state and greatly have impacted my sense of
normality and my lack of self-control and my ability to take
time to rationally think about things before I act.  Clearly,
no one in their right mind would ever pick up a hacksaw and

attempt to saw off their own arm. I was obviously in a very dark place and in need of serious help, which, sadly, I never got.

But what hurts me the most out of all of this is that I know exactly what a life of pain feels like and the lasting damage that it can cause someone for the rest of their life. But, even with knowing all of that firsthand, I still failed the people that I love and care about most in life. I made selfish, irresponsible, disgusting choices -- not once, but time and time and time again -- that are going to affect them for the rest of their lives. I should have stopped that cycle of hurt with me, but I failed at that, too. I failed my victims, I failed my family, and I failed myself by becoming just like the people who have done so much damage to me in my life.

Your Honor, I have a statement that I'd like to ask permission to address to Minor Victim 1 and Witness Victim 1, if you'd allow me to do that.

THE COURT: And what's your position, Government?

MS. PRESTON: Your Honor, I think he can --

THE COURT: You can address the Court.

MS. PRESTON: -- direct those issues -- but he has to address the Court.

THE COURT: You have to address me.

THE DEFENDANT: So I can read it to you?

THE COURT:  You can read it to me.

THE DEFENDANT:  Okay.  To my ex-girlfriend, Minor Victim 1:  Words can't express my remorse for the pain that I've caused you.  We were both young and dealing with our own problems, two hurt people trying to make it work and help each other.  I failed you in so many ways.  I couldn't even help or fix myself, so I had no business even trying to be in a relationship with anyone, let alone trying to help someone with their own problems.  I was the older one and I should have led by a better example, and I did just the opposite.

I'm sorry for all of the pain and trauma that I've caused you.  I hope that you have the best life that you possibly can.  You're a bright, amazing person, and you deserve the best.  I hope that you go as far as you can possibly go in life and that you have the best future possible.  I know that you can do anything that you set your mind to.

To Witness Victim 1:  I'm sorry for all of the chaos and pain that I've caused you and your family.  Looking back from today, I see that you were just a single mom struggling to raise your two daughters and grandchild the best that you could, and just trying to make ends meet, just like my own mom.  I know today that you did everything that you could with your daughter's best interest in mind.

Looking back now, I see that everything that I did, that I thought was good, to try to help your daughter was the

exact opposite.  I failed both of you entirely time after time.
I wish you and your daughter nothing but the best and the
brightest futures possible.

It disgusts me when I look back at the person that I
was and the horrendous choices that I made, to think that you
and your daughter could have been seriously hurt or killed
simply because of my selfish, thoughtless decisions makes me
sick.  Words can't express how sorry I am for the pain and
trauma that I've put you and your daughter through.  I pray
that you will both somehow be able to overcome this
life-changing event and be able to move forward in your lives
and still have a bright future.

Next, oddly enough, I would like to take the time to
thank the confidential informants that are on my case for
coming forward and making the right decision since, clearly, I
didn't.  Without their selfless decisions, I might not be able
to be here today, to be held accountable for my crimes.  And,
even worse, there might be two innocent people who wouldn't be
here today either.

I thank God every day that my despicable plan didn't
work.  I can't even begin to imagine the irreversible damage
that I would have caused had my plan worked.  And for what?
Absolutely nothing.  Even had my plan have worked, it wouldn't
have helped my situation one bit.  In fact, it would have done
the total opposite.

The decisions that I made are disgusting, inexcusable, and totally selfish. I was a coward who didn't want to take responsibility for my own actions, and I was looking for the easy way out with no regard for the impact that it would have on anyone else. This experience has changed me and opened my eyes in so many ways. Life is a precious gift that can be lost so quickly, and I'm extremely grateful and thankful that no one lost theirs because of me.

Next I would like to apologize to my family. I can only imagine the pain and disappointment that I've caused you, all the money that's been wasted as a result of me being a failure as a son, attorneys' costs, phone calls, commissary, and the stupid way that I've always showed my appreciation for everything that you've done for me by the way that I talk to you on the phone when I get mad. It doesn't matter what's wrong with me or how much stress I'm under. There is no excuse for any of it, and I absolutely hate myself for it. I feel like a total piece of human trash every time I think about it.

I hope that you can forgive me for all of the pain and stress and sadness that I've caused you. It's a wonder that, even after all of the horrible things that I've said to you and put you through, that you still love me and that you're here for me and somehow still proud that I'm even your son. You are truly a blessing from God, and I promise you that I will never take you for granted or disrespect you or fail you again.

Next I would like to apologize to this Court, to Your Honor, to Ms. Preston, and to Mr. Willmann. I've said some horrible things about all of you when I was upset on the phone, venting to my mom, and there is no excuse for any of it. I had zero self-control, and that's exactly what put me where I am today.

But even though -- even through all of my blatant disrespect and nonexistent self-control, Ms. Preston has never given up on me. She is a completely better person than I. Throughout all of this, not only has she remained open-minded in dealing with me and my attorney in negotiating a plea, she has literally given me a second chance at life. She allowed me to be able to move on from this situation without ever having to be a sex offender. That is a huge thing to me and speaks volumes about her as a person.

If I was the same person that I was five years ago, and we were sitting here today, and I was her, I'd be asking for the max. I'm very thankful that Ms. Preston sees that I am not a lost cause. I've tried my best to let my actions show my appreciation for her willingness to give me another chance at life. When I caught my fed case in 2019, I felt like life was over. There was -- and that there was no hope for me. And my actions sure showed it.

After getting -- after going fed for making horrible decisions, I still continued making horrible decisions. I

received multiple conduct reports in 2019 and went into a total downward spiral of self-destruction.  I'm proud to say today that I haven't received a conduct report in almost four years.  By seeing Ms. Preston's willingness to work with me and her seeing potential in me, alongside my attorney's confidence in me and my own desire to change and become a rehabilitated, productive person, I came a long way from the sorry excuse of a man that I was.  I know in my heart now that I am not a lost cause and that there is still hope for me and that change is never impossible, and I've done my best to let my actions show the progress that I've made to become a better person.

I know that I still have a lot of work to do and a long way to go, but I know that I have a lot of people in my corner supporting me, and I will not let them or myself down.  I will never be a failure again.  This is not the kind of life that I want for myself, and I know it's definitely not the kind of life that my family wants for me either.

So these are the things that I'm going to do to make sure that I'm never in this position again:  I'm going to continue with my mental health treatment and DBT treatment while I'm incarcerated and when I'm released.  I'm going to attend a trade school while I'm incarcerated so that I can learn the skills that I'm going to have to need to be able to obtain a good job, that I can make a career out of when I get out, so that I can support myself and my family and have a

solid foundation that I can build a good future on and be able to start a family of my own.

I want help, and I feel like this is the first real opportunity that I've ever had to get it. I understand myself and my problems that I face now, for the first time in my life. I understand that it's going to take a lot of hard work and dedication to get my life on the right track, but that's something that I'm more than willing to do. It's not always going to be easy. There are always temptations that I face and have to deal with on a daily basis. Even in jail, it's easy to give in and use drugs that are surprisingly readily available even in jail.

But that time in my life is dead. I don't ever want to do anything that could compromise all of the progress that I've worked so hard to make. I've been locked up since I was 23 years old. I'm now 29. I have matured and changed into a completely different person in these last six years. I know my true potential now and desperately want a chance to be able to be with my family again while they're still alive. My grandparents are both 89 years old, and my mom is 62. I truly want a chance to be able to build a productive life for myself and my family and the chance to start a family of my own and finally be able to have the kind of life that will make my family proud.

I know that I am more than capable of doing this. All

I need is a chance from this Court to be able to do so, not
multiple chances, just one, and one only last chance, to prove
to everyone that I am not a failure and that I am
rehabilitated, I am a rehabilitated person who still can have a
good life and make something of myself.  I just pray that you
will please give me this chance.  I understand completely that
if I am given this chance, that this is it.  There will never
be any more chances.  I just pray that you find me worthy to
give me this chance.  Thank you for your time.

THE COURT:  Thank you, sir.

Mr. Sample, if you'd come up to the lectern, you may
make an argument on behalf of your client.

MR. SAMPLE:  Thank you, Your Honor.

Your Honor, I believe that the overarching principle
of parsimony is of really tremendous importance in this case
and what is a sentence that is sufficient, but not greater than
necessary.  This entire case which brought us here today, and
the stories that underlie it, are all really tragic.

The Court has heard a lot from Mr. Elliott, as seen in
the Presentence Report, some of the extensive mental health
history that Mr. Elliott has had.  I can't imagine what it's
like for a young man, a child, one and two years old, having
these types of severe mental issues so early on, and then, as
noted in our sentencing memorandum, at age seven in a situation
where his mother is taking him in to try to get him treatment.

He's calling out, crying out to the doctor, saying, "I don't understand why nobody seems to be able to help me."

And in some way, this is not to take away from his responsibility, but the system failed. It failed Mr. Elliott, because if he maybe had been, you know, with the right doctors, he might have been able to get some treatment, to be able to address his borderline personality disorder sooner.

In many ways, where we are, the proceedings, the indulgences that the Court has allowed Mr. Elliott, undergoing two competency evaluations, it's given us an opportunity to learn a lot about Mr. Elliott's mental health and what his true underlying problems are, and which are -- what are precipitating a lot of this behavior that he's been engaging in at the state level since he was 18 years old.

And it's just built till it got to this ridiculous situation where he's making these threats and things on the phone, the murder for hire, the witness tampering, which is not very far off from some of the things when he was 18 years old, making threats, intimidation. All along the while here, what you have is just this constant theme of this type of behavior with the absence of any kind of real mental health treatment, no proper diagnosis, no dialectical behavior or therapy.

I have never, in all the clients that I've represented, had a client tell me that at some point in their life, because of their mental illness, that they tried to saw

their own arms off.  You know, the severity of the mental
illness that Mr. Elliott has is tremendous.

        And, you know, when he spoke in his allocution about
how he shouldn't have been in a relationship with Minor Victim
1, that's 100 percent true.  He wasn't mentally prepared to be
in a relationship with anyone.  He had all these struggles that
he wasn't prepared to be able to deal with.  And even then,
even though he got into that relationship, you know, he had a
responsibility to be an adult and make better choices.

        But he sees that now.  And I personally can tell the
Court that over the course of representing him, which is --
this is -- this case has been going on for a long time, the
tremendous change that has happened in him to get him to the
point -- you know, I -- the Court knows this all too well, that
for a defendant to really, like, truly internally accept
responsibility for their actions is oftentimes one of the most
difficult things that you see.  It's easy for someone to come
in here and say they're sorry, but it's a lot harder for them
to very introspectively look at themself, reflect on their
life, and think about what the future may potentially lie for
them.

        It's easy to say that we're just going to incapacitate
Mr. Elliott because he's a danger and I don't know what he's
going to do.  That's the easy choice.  The hard choice is to
say that, "I have some faith, I have some faith that, with

treatment and what I've heard from you today, that you can and will make some positive changes in your life, that you can finish this sentence that's imposed and then go on to be a productive citizen."

And I think that he can do this. I think that he can do it because he's already begun to demonstrate his ability to be compliant with rules and regulations. That statement that he prepared and read as his allocution is not something that I sat down with him and prepared. He did it entirely on his own, 100 percent. And it is a reflection of the communications and the things that he has been telling me and in my efforts over the entirety of the course of my representation of him, to try to guide him.

And even, you know, to really reiterate, his life is not over, no matter what the decision is of the Court today. And he is strongly, strongly desirant (phonetic) of, you know, the opportunity for him to hopefully go on and have his own family one day. He's 29 years old, 29 years old, and been in and out of jail since he was 18, now culminating in this huge federal case.

But now, for the first time in his life, he's got a -- we have a clear diagnosis of what's wrong with him. There's this program in the Bureau of Prisons called Stages that is specifically designed to be able to help individuals with borderline personality disorder. And, typically, from what I

have seen in other cases, when you have a defendant with this

kind of history of mental illness, where they've never actually

had an opportunity to take treatment that could address it, we

just don't throw them in the trash.  We give them a chance for

them to take the program and for them to be able to try and

better themself.

Mr. Elliott doesn't need a sentence of 55 years for

him to be able to rehabilitate himself and address these

issues.  You know, the Court has wide discretion that's

permissible under the plea agreement, the 3553 factors, and I

respectfully submit that a sentence of 10 years is more than

sufficient to be able to address the severity of the conduct

that's in this case.

When you look at the statistics from the Sentencing

Commission and you look at the witness tampering, you look at

the murder-for-hire charges, terrible, terrible crimes, but the

median sentences that are imposed in those cases is 10 years

for someone with a criminal history category VI for murder for

hire over the past five years, 180 months for witness tampering

over the past five years for someone in criminal history

category VI.  And I can only venture to guess that in most of

those cases, you don't have a defendant that has the extent of

mental health problems like Mr. Elliott has and where they

haven't yet had the opportunity to take treatment to be able to

fix this problem.

1    THE COURT:  Counsel, wasn't your client in counseling

2    since he was seven years old, he's been in different treatments

3    and hospitalizations?  He's gotten lots of mental health

4    treatment.

5    MR. SAMPLE:  He has, Your Honor, but with different

6    diagnoses than what has been finally indicated in the last

7    evaluations that this Court has accepted from the last

8    competency evaluation that he underwent.  And it was in that

9    evaluation where the Court's own expert indicated that she

10   didn't see a lot of the things that were indicated in all those

11   previous diagnoses.

12   That's why I'm arguing that the mental diagnoses that

13   he really had previously were not accurate.  They didn't have

14   the time, like we had here, where he's at the detention center

15   in Chicago, where we have people who are watching him for an

16   entire evaluation period to really learn who he is.  So when

17   you have those other inpatient/outpatient situations, it's not

18   really correlative, right, to what we know now, because this is

19   the first opportunity when there's been a real setting to

20   determine what's wrong with him.

21   And what did the Court's own expert say?  That he

22   would benefit from this kind of treatment, that he would

23   benefit from dialectical behavior therapy.  He never had --

24   THE COURT:  In the Bureau of Prisons.  The Bureau of

25   Prisons --

MR. SAMPLE:  Absolutely.

THE COURT:  -- treatment.

MR. SAMPLE:  Yes.  Correct.

THE COURT:  One more question:  Your client, in his allocution, talks about his learning disability.  His learning disability is his attention deficit hyperactivity disorder?

MR. SAMPLE:  That's correct, yes.

THE COURT:  Because he's very intelligent.

MR. SAMPLE:  He's extremely intelligent.

THE COURT:  Extremely intelligent, okay.

MR. SAMPLE:  Extremely intelligent.

THE COURT:  All right.

MR. SAMPLE:  So much potential.  You know, the other 3553 factors related to deterrence, of course that rings importance in here, not just specifically, but also generally.  We can't run around here saying that we're trying to have someone killed.  You know, other people have to know.

THE COURT:  He didn't just say it.

MR. SAMPLE:  That's correct.  He took actions, he did.

THE COURT:  He took very substantial steps towards having these people murdered.

MR. SAMPLE:  Yes.  And, thankfully, his plan was thwarted.  But, ultimately, even behind that, we look at what's driving this.  He's not -- he's got this impulsivity that is a by-product of this borderline personality disorder that is

prompting a lot of this conduct and stuff that's going on, but it's not an excuse. It doesn't excuse the criminal culpability, but it should mitigate, ultimately, the sentence that is imposed by the Court.

THE COURT: Okay.

MR. SAMPLE: And I will just, you know, simply conclude, Your Honor, that I think, as I said at the beginning, that the focus has to be on the principle of parsimony, a sentence that is sufficient, but not greater than necessary. A sentence of 55 years is not that. A sentence of 30 years is not that. I don't even believe a sentence of 20 years is consistent with the principle of parsimony.

It's too -- people that go to the Bureau of Prisons and participate in programs and treatment, if you haven't gotten it together in 10 years of being in prison, you're probably not going to get it together. And then the remainder of the sentence that the person is serving, it's purely retributive at that point. And for someone with these kinds of deeply held mental health problems, who hasn't yet had the chance to go and take the kind of program that the Bureau of Prisons has, who can demonstrate to the Court, society, and everyone that he can get his act together, he deserves that chance, Your Honor.

THE COURT: Thank you, Counsel.

All right. Ms. Preston, you may present on behalf of

the government.

MS. PRESTON:  Thank you, Your Honor.  And, Your Honor, for the record, can you see what's on your screen in front of you?

THE COURT:  I can see the screen.

MS. PRESTON:  Thank you, Your Honor.

Your Honor, for the reasons set forth here today, and in my sentencing memo at docket 244, and my under-seal memo at 245, for just punishment, for justice for the victims, but above all, for safety of the community, the government is asking for a sentence of 55 years' imprisonment, five years' supervised release, and, as agreed, $5,000 each in restitution for these victims.

Turning first, as we do, to the nature and circumstances of the offense under 3553(a), Your Honor, there is nothing more egregious, more ruthless, more coldblooded, callus, and calculated than hiring a hitman to kill, to murder, another human being.  And that's what Mr. Elliott did here, and not just one human being, two human beings: his 16-year-old ex-girlfriend, Minor Victim 1, someone who once loved him and someone he once claimed he loved; and Minor Victim 1's mother, who I'll refer to Witness Victim 1.  He didn't just plot to murder them once.  He tried to murder them and have others murder them three times, three separate plots spread over time to kill two human beings, murders planned by Mr. Elliott from

four different state and federal jails, all because they were in his way.  They were witnesses against him, and that made him mad.

This building, Your Honor, sees drug traffickers, kidnappers, bank robbers, pedophiles, fraudsters, and all of these crimes are serious offenses, but this defendant tried to have two people killed three times from four different facilities to silence their testimony and to obstruct justice. This is as serious as it gets.

Judge, today I want to begin by simply summarizing the nature and circumstances of Mr. Elliott's offenses, but highlight, because I didn't in my memo, how those offenses have escalated over time.

As you see from the timeline on the screen, Your Honor, by 2016, when Mr. Elliott was only 23, he had threatened someone with a knife, he had told a victim, over social media, that he would rape her in the anus and cum on her face and videotape himself laughing while doing it, and that he would stab her so fast she wouldn't know what happened.

He threatened an eight-month pregnant victim that he would pay someone to kick her in the stomach in order to kill her unborn child and that he'd put a bullet in her head.  She called the police on him.

He strangled his own mother until she had the ability to escape from him and flee to a hospital.  He violated a

no-contact order for a different young woman while she was in
an examination room at a hospital, and he violated a protective
order entered to protect his own mother against him.

By 23, he had been convicted and sentenced to three
and a half years' imprisonment for theft, obstruction of
justice, intimidation, and threats to commit a forceable
felony.  He was charged, released, and undeterred.  In fact, he
was emboldened.

And then he spent his time behaving like a wanna-be
gangster.  By then, he was 24, and that's when he met Minor
Victim 1.  She was only 16, Your Honor.  And you know, Judge,
a lot of teenage girls make mistakes when they're choosing
their first boyfriend.  They get heartbroken, they heal, and
then they learn and move on.

But, tragically, for Minor Victim 1 and her family,
that is not what happened when she met Mr. Elliott.  He
supplied her with heroin and he surrounded her with others who
did the same.  He alienated her from her mother and her sister.
He sexually exploited her and he degraded her.  Just a few
blocks from this building, Your Honor, this defendant took this
16-year-old girl to the canal and filmed himself saying, "Hey,
you ain't on shit if you ain't ever cracked some ass while
you're on the mother fucking canal," while he was filming
himself either vaginally or anally having sex with her.

And, Your Honor, he beat her repeatedly.  If you

recall from when we were preparing for the trial in August of
2017, Mr. Elliott beat Minor Victim 1.  There was a recorded
dash camera that captured the aftermath, and in it you can see
Minor Victim 1 with a swollen lip, crying hysterically,
telling the police officer that Mr. Elliott had naked pictures
of her.  Mr. Elliott told officers that Minor Victim 1 was 16
years old and that, to use his words exactly, "The bitch
doesn't know better."  As a result of that incident, Minor
Victim 1, as you heard in her letter today, you can still see
the part of her lip that's still damaged from that.  She has
recurring damage to one of her eyes from the times that he beat
her in the face, because that wasn't the only time he did it.

The Court first -- for the first time, ordered a
no-contact order against Mr. Elliott.  Judge, this was the
first of many, many times a judge sat on a bench and told
Mr. Elliott, "Do not contact her in person, by telephone, by
letter, through an intermediary, or any other way.  Leave her
alone."  But he didn't.  She was, to use her words, "under his
thumb and at his mercy."

All the while, Minor Victim 1's mother witnessed
Victim 1, wanted nothing more than to protect her child from
this monster.  Mr. Elliott has officially given new meaning to
a mother's worst nightmare.  Victim Witness 1 had to sit
powerless as she watched her baby girl succumb to this
physically and mentally abusive, recently released felon as he

poured drugs into her child, stripped her of her dignity, and left her beaten by the side of the road.

And while her daughter was still healing from that battery, Witness Victim 1 hoped that a judge's court order would protect her child, but you see, Judge, the rules don't apply to Mr. Elliott. He has no respect for a mother's wishes, no respect for court orders, no respect for restriction, and certainly no respect for the law or human life.

Minor Victim 1's mother brought her child home and was trying to do what she could to help her get off of heroin. And she sat comforted, as Minor Victim 1, in thinking Mr. Elliott was on GPS monitoring from jail and subject to that court order. And you heard today in that letter, Minor Victim 1 thought to herself, "Maybe now I can start over," because, as she said, "It was either going to be juvenile or a body bag."

But this was just the beginning. With the battery charges pending, and while on GPS monitoring, as you know, Mr. Elliott secretly tried to deliver heroin to Minor Victim 1 at her home, using Facebook Messenger. Thankfully, Witness Victim 1 was monitoring Minor Victim 1's phone and called the police. That's the same day a mother had to learn that what Minor Victim 1 said to that police officer by the side of the road was true. Yes, Mr. Elliott did have naked pictures, to use her words, or child sex abuse material, to use

my words, of Minor Victim 1 that he had produced and
distributed to her.

Mr. Elliott's release was, of course, revoked. And,
again, he was ordered to have no contact with Minor Victim 1.
He was then charged with 38 counts of invasion of privacy for
continual -- sorry, continuing to violate the Court's
no-contact orders that were entered to protect a child from
this adult. Now, each of these matters. The battery case, the
delivery of heroin to a minor, the invasion of privacy case,
were open and pending in May and June of 2019, but he wasn't
willing to accept responsibility for what he did. He blamed
Minor Victim 1 for turning against him and Witness Victim 1
for calling the police, and now they were witnesses against
him, and he wanted them dead.

In February of 2018, Mr. Elliott was in the custody of
the Shelby County Jail. He was removed from society and in
jail, incarcerated. And now that he was behind bars, Minor
Victim 1's mother and Minor Victim 1 again breathed a sigh
of relief. But, as you will hear me say, not even jail can
protect the community from Robert Mason Elliott. He wanted to
kill them, but he was in jail, so he couldn't do it himself.
He had to hire someone else to do it for him.

So he turned to his mother, Debbie Elliott, who is
here in court today. This defendant instructed his own mother
to hire a Hells Angel to kill Minor Victim 1's mother, who was

a witness against him, and to kill the Shelby County prosecutor who wanted to put him in prison.  In jail calls, he told -- the defendant told his mother, "This has to be done, Mom, or it's over."  And she agreed and began communicating with that Hells Angel, as he instructed.

Your Honor, even though Mr. Elliott wanted them dead, Mrs. Elliott just wasn't willing to go quite that far.  Without telling her son, she withdrew from the plan to kill the witnesses and prosecutor and, instead, paid $500 to this Hells Angel to have, to use her words and quote from her text, "the living shit beat out of Witness Victim 1, but not dead."

Once Ms. Elliott provided the Hells Angel with photographs, locations, and a description of Witness Victim 1's vehicle, Mr. Elliott, over a jail call, asked his mom if she did what he asked her to do, and she said, "Yes."  Your Honor, thank goodness law enforcement was listening to those jail calls, and they intervened.  This time they were able to, and both Mr. Elliott and his mother were charged, and Minor Victim 1 and Witness Victim 1 were lucky to be alive.

And you heard today, Witness Victim 1 had to break the news to her daughter, while she was in rehab, trying to recover, that her ex-boyfriend just tried to have her killed and tried to have her mother killed.  The first plot failed.

But at first, if you don't succeed, Mr. Elliott tries again.  Undeterred, and with his mom behind bars, Mr. Elliott

turns to inmates at the Shelby County Jail and IDOC to help him finish the job. Between March 19 to March 29, 2019, three different inmates separately reported to law enforcement that Mr. Elliott was trying to hire someone to kill Minor Victim 1 and Witness Victim 1. And, as he said, thank goodness these inmates weren't the type to take him up on his offer. They reported this to law enforcement, and law enforcement was again able to intervene. Second plot failed.

But that didn't phase Mr. Elliott either. Mr. Elliott's mother pleaded guilty, she agreed to testify against her son, and was sentenced for her part in the conspiracy with the Hells Angel. Despite being ordered to have no contact with Mr. Elliott, because she was a witness against him, she and Mr. Elliott spent the next year violating that order until she was arrested, because, again court orders don't matter to this family.

By December 28th, 2018, Mr. Elliott was charged by federal complaint and other offenses and detained and transferred. Undeterred, and with his mom either unwilling or unable to help him, Mr. Elliott wasn't about to give up. In May, he wanted out. He filed a motion through his attorney asking Judge McVicker Lynch to consider releasing him.

Now, Special Agent Willmann and I knew why he wanted out. Judge McVicker Lynch did not know, because we couldn't disclose it to her. And, Your Honor, downstairs, on the second

floor, Mr. Elliott sat at a table with his counsel beside him and a smile on his face and, through his attorney, swore up and down that he could be safely released into the community. His grandfather even testified on his behalf.

What Judge McVicker Lynch didn't know, because we couldn't tell her, was that while he sat at that table, a smile on his face, trying to get released, trying to convince a federal magistrate judge that he could safely be released, he was already executing his third plot to kill Minor Victim 1 and Witness Victim 1, this time from two different federal jail facilities.

And you're already well familiar with this plot, Judge. It was a subject matter, among many, of our trial. He approached a cooperating witness and asked him to give him the number of someone in a cartel, who was a hitman. And, again, Your Honor, by luck, the CW wasn't the kind of person who was willing to do that, and he told his attorney, who told us.

Now, Mr. Elliott, however, truly believed that he would be released by Judge Lynch on May 21st and told the CW that once he was out, he, Mr. Elliott, could pay a hitman with military-style weapons at his grandfather's house, a Suzuki motorcycle, grenades, and shoulder-launched multipurpose assault weapons buried in his grandfather's backyard.

To evade detection -- and, yes, Your Honor, he is very smart. I've told that to him personally. He is very smart,

but he is scary smart. To evade detection, Mr. Elliott decided
to use a different inmate's PIN number to try and avoid law
enforcement overhearing what he was doing. And instead of
sending a letter himself, he had the cooperating witness send a
letter, that you're looking at, to the cooperating witness'
wife, so that could evade detection, too.

As set forth in the letter he sent to the person he
thought was a hitman, Mr. Elliott identified Minor Victim 1
and Witness Victim 1 by their first and last name, Facebook
accounts, and location. He told the CW's wife that Minor
Victim 1 worked at McDonald's, described the vehicle, and
said, and I quote, "They're witnesses for the state and feds on
someone I know. They're trying to put him," meaning
Mr. Elliott, "away for life. So when you deliver the
motorcycle to them and take care of them, being careful."

As you know, Mr. Elliott even involved, unwittingly,
his grandfather in this plot, and had him pass information
between the cooperating witness and Mr. Elliott in order to
receive word to the hitman and get the hitman's number. On
June 6th, over jail calls, Mr. Elliott placed a call to a
person he believed was a Mexican cartel hitman, and he hired
him in coldblooded coded language, from jail, to murder two
people, Minor Victim 1 and Witness Victim 1.

Thank God, the CW came to us and we could intervene.
And, thank goodness, Special Agent Willmann had the good sense

to check other inmates' records for calls to Debbie and Robert Edward Elliott, because, instead of calling a real hitman, law enforcement had instructed the CW to give Mr. Elliott the number for an undercover task force officer for the FBI. And, Your Honor, that June 6th call is chilling. Mr. Elliott was animated, he was excited, it was coldblooded.

And we searched, then, Mr. Elliott's grandfather's house and recovered, agents did, an arsenal of weapons, one purchased, by the way, by Mr. Elliott through a straw purchaser, because he had already been convicted of two felonies. Of course, we recovered the motorcycle and even notes his grandfather took to pass on the information on his grandson's behalf. And, despite his grandfather's lies to FBI agents and the intentional obstruction of justice through recovering his mother's cell phone used to send text messages to the hitman on Elliott's behalf, Your Honor, we recovered all of the evidence needed to prove our case in court, despite Mr. Elliott's grandfather obstructing.

We listened, Your Honor, during and after that search, to Mr. Elliott calling friends from jail, giddy because the search hit the news, asking whether law enforcement might be looking for bodies. Your Honor, that was the third plot, and, thankfully, it failed, too. Two human beings, a 16-year-old victim, a witness who was her mom, three plots to kill them, all from jail.

Judge, this criminal behavior is ruthless, it's brazen, it's terrifying, particularly because it all happened when he was supposed to be safely detained and removed from the community, but jail walls mean nothing to Mr. Elliott. There are no words adequate enough to describe how serious the nature and circumstances of this offense are, murder for hire, witness and victim tampering of a minor, of a mother, acts of exploitation, acts of drug trafficking to a minor, acts of obstruction to justice.

And I want to emphasize here that there is no instance, there was no occasion in which Mr. Elliott himself decided to withdraw from any of these plots. Law enforcement had to intervene. Minor Victim 1 and Witness Victim 1 are lucky to be alive today. The nature and circumstances of this crime alone cry out for a sentence of 55 years.

But we have to also consider the history and characteristics of Mr. Elliott. In mitigation, like any person who stands before you, there are facts about them that are both aggravating and mitigating. In mitigation, I want to say on the record, and with 16 years' experience, I do not believe that Mr. Elliott is a pedophile. He did not have a collection of child sex abuse material. He does not have a sexual interest in prepubescent children. He had a sexual interest and had sex with a 16-year-old girl when he was 24.

And if it had stopped at that, we wouldn't be here.

But that's not where it stopped.  As submitted under filing and under seal, something I can't disclose today in open court publicly, and I do ask you to consider those factors under 3553(a), but what I do want to say, without revealing what they are to Mr. Elliott, his mother, and his grandfather, that those acts matter, and it was a step in the right direction.  And the Court should consider them, and they were sincere.  And that is why, Your Honor, in addition to his acceptance, that I'm not asking for a maximum sentence here today.  I'm asking for 55 years' imprisonment.  The guidelines are 360 months to nine years.

I'll also add that Mr. Elliott, although not so much on the phone, but in person and in meetings, has always treated me with respect despite me telling him straight up that I was going to do my job.

Mr. Elliott does have a significant and serious history of mental abuse, but it cuts both ways, Your Honor.  In mitigation, there are 900 pages of medical records detailing Mr. Elliott's long-standing mental health issues.  And for a time, they were, I believe, misunderstood and misdiagnosed, and that is a tragedy.  And then they were also compounded with drug use, which was a choice by Mr. Elliott.

But, as you noted, Your Honor, this is not someone who's had no mental health treatment.  Sometimes Your Honor sees defendants before her at sentencing that have gone decades

without any mental health treatment at all.  This is a
defendant who's had mental health treatment since he was seven.
He's been psychiatrically hospitalized and, since at least
1999, treated by Behavioral Healthcare of Columbus, Gallahue
Mental Health, Options Treatment Center, and he was diagnosed
in 2014 with bipolar, other psychotic disorder, and an
unspecified personality disorder, as well as with PTSD.

But the problem, Your Honor, is, and this is so
important, Mr. Elliott didn't return for follow-up.  It's
indicated directly in the records, and that's key here.  He has
had three patient admissions at Options.  He was seen again at
Gallahue for four months in 2015 and two months again in 2017,
leading up to those offenses and as a result of his
convictions.  But, again, no follow-up.  So I disagree with
counsel that this has been untreated.  The treatment just
hasn't worked, and people have been at it since he was a kid.

Now, turning to Dr. Kim's report filed yesterday,
Mr. Sample acknowledged that Dr. Kim has only spent a half day
in February with Mr. Elliott at MCC and two and a half hours by
phone with Mr. Elliott before rendering his opinion detailed in
his three-page letter.  Your Honor, that does not make for a
reliable and proper risk assessment.

Now, here's what's interesting about that report:
Dr. Kim saw Mr. Elliott at MCC Chicago in February of 2022,
before you ruled on the second competency evaluation.  After

you ruled that Mr. Elliott was indeed competent, and with no treatment whatsoever in Clark County Jail, Dr. Kim's opinion is that Mr. Elliott's clinical condition miraculously improved. And he seems to know that simply from speaking with him on the phone for two hours in December.

We have come a long way, Your Honor, from Mr. Elliott, quoting the movie *Training Day*, telling one of our informants that he was willing to stuff peanut butter up his anus, pull it out and eat it in front of you to prove that he was insane, to sitting here, just like he did with Judge Lynch, to show you that he's just fine and he can be safely released. What I mean by that, Your Honor, is that Mr. Elliott can control his behavior when it suits him. He has engaged in past efforts to manipulate proceedings, to manipulate psychologists, and a two-hour interview in December just doesn't cut it.

You heard in April how he was doing in those jail calls that were played in this court. And, Your Honor, I would say, with her sitting right here, it's no wonder that Mr. Elliott's mother has been on occasion too scared to say no to him. She's been strangled by him, and you heard how he speaks to her in these jail calls. He can and will turn on someone on a dime when it suits his purpose.

And, Judge, if you need any more reason to discredit Dr. Kim's opinion, please see page 3, the first full paragraph. It says, and I quote, "Mr. Elliott also has protective factors

such as support from his family, improved insight, and better
impulse control." Judge, support from his family as a
protective factor? I nearly fell out of my chair. His mother
was his co-conspirator and his grandfather has obstructed
justice. These are the people Mr. Elliott goes to for support.
His mom is the person he goes to when he wants to hire a Hells
Angel to kill people, and his grandfather is the person he
turns to to pass information on to a hitman. These are the
people he goes to to commit crimes when he can't do it from
jail.

The most trusted scientific, reliable opinions come
from Dr. Szyhowski and Dr. Watson. I know you are familiar
with those reports. They are the BOP psychologists who
submitted expert opinions in this case, administered tests,
observed him for months when he knew it and when he didn't, and
interviewed him in person for hours. And applying their
combined decades of experience treating violent incarcerated
criminals, they issued several opinions, Your Honor. And as
set forth in paragraph 200 of the PSR and page 23 of
Dr. Watson's report, it says, "Mr. Elliott's antisocial and
borderline personality features are pervasive and
characterological and are unlikely to significantly change in
the near future."

She also found this year -- this year, sorry, excuse
me -- last year, in April, his risk of self-harm and harm to

others is of notable concern by trained professionals based on his history and the interaction of his impulsivity, antisocial and borderline personality features. Dr. Szyhowski also found that, although borderline personality disorder can respond favorably to psychology, the course of treatment tends to be lengthy. And there's a catch. He said the greatest benefit is typically seen when an individual engages in a dedicated course of psychotherapy specifically designed to address the behaviors and coping skills. Should he elect to participate, he's likely to benefit. Should he decline to participate, he will continue to experience these symptoms.

Judge, in other words, you will have to trust that he will actually participate. And if past is prologue, he'll just fail to follow up. Even if he does elect to participate, the treatment is long. And even then, the doctors say the risk to harm is great and of notable concern. It is one heck of a risk, and also ignores the need for just punishment.

Judge, I spent pages in my sentencing memo outlining in detail Mr. Elliott's criminal history, 19 points in 23 years before he was incarcerated, multiple violent crimes, probation violations, new crimes while on pretrial release, chance after chance after chance to turn it around and be deterred. His criminal history is deplorable. And that doesn't even capture the crimes he committed after he was incarcerated.

And as you read in my brief, his history of jail

infractions was attached as Exhibit C.  To only name a few,
interfering with security operations of a facility, sexual
misconduct, attempting to control the behavior of another
inmate using narcotics, possessing contraband, receiving mail
falsely disguised as legal mail, using an inmate's PIN and
tablet to call his mother, which is, of course, a security
breach.

And, finally, I'll say that these claims are
escalating.  They've escalated and escalated to the point where
he's tried to have people killed multiple times.  The history
and characteristics of Mr. Elliott weigh in favor of a 55-year
sentence.

I'll end by addressing justice for the victims and
protection of the community.  You heard from Minor Victim 1
and Witness Victim 1 today.  Your Honor, from the beginning,
Mr. Elliott didn't see Minor Victim 1 as a person.  He saw
her as his property, something lifeless, something worthless,
something that can be beaten, degraded, and discarded.

And she was only 16.  16-year-olds are entitled,
Judge, to make mistakes in life.  They're entitled to get
heartbroken, healed, learn, and move on.  But now, as you heard
her say, this 22-year-old will live with this mistake for the
rest of her life.  And he didn't see her mother as a human
either.  She was just someone who got in his way and had to be
snuffed out.

And despite all of that, Minor Victim 1 is the
amazing woman that she has turned out to be, despite living in
constant fear in her own home.  They've been moved multiple
times, they've been terrorized, they've been traumatized, and
they spend their lives looking over their shoulders because of
him.  I spent yesterday looking at a mom who doesn't want her
daughter and family to go to the grocery store because she's
afraid of a hitman coming around the corner.

And, Judge, this is heartbreaking, but most of the
time Ms. Korobov and I can sit with victims and say, "Hey, he's
behind bars, he's in jail, you're safe now."  I can't do that,
not with a straight face.  They are so lucky to be alive, but
they will live in constant fear forever.  What manner of
punishment will ever be enough to capture that kind of lifelong
torture, and he wants out in 10 years, when she's only 32.

This judge has -- or, I'm sorry.  This defendant has
demonstrated he cannot be deterred.  Court orders, parole
violations, arrests, convictions, incarcerations, no one and
nothing has and will deter him.  Everyone who has tried has
failed.  Every jail facility in which he has been detained has
failed.  He doesn't need deterrence.  He needs removal from
society, incapacitation.  He needs and deserves a 55-year
sentence, which brings me to my last point.

Your Honor, when a judge detains or sentences a
defendant, they typically believe they have done their job to

reasonably ensure the safety of the community.  But not even
prison walls can protect the community from those targeted by
Robert Mason Elliott.  I shudder to think that if a prison wall
can't deter Mr. Elliott, then how can the public possibly be
safe from him when he is released?  There's no probation
officer who can supervise him.

This is a defendant who has no respect for the law,
who's dangerous, violent, and impulsive.  He's demonstrated a
long-standing flagrant disrespect for life, and he must be
punished for that.  Hiring someone to kill a human being is one
of the most serious crimes charged in federal court.  Hiring
someone to murder two human beings who are witnesses against
him speaks to a shameless disrespect for human life.  Those
victims will likely never rest easy again, because you heard
minor victim write she and her daughter will surely rest more
easily knowing that he was justly punished and that he is
serving a 55-year sentence.

For the reasons I've said here today -- for just
punishment, for justice for the victims, for safety of the
community -- the government is asking for a sentence of 55
years' imprisonment.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Any final comments, Counsel?

MR. SAMPLE:  Yes, Your Honor.

THE COURT:  Briefly.

MR. SAMPLE:  Yes, Your Honor.  Your Honor, for about
the past year, you know, the changes that Mr. Elliott has have
really awoken in him are not just with him, but also with his
family.  His mother, I can proffer, has been going to
counseling herself and has learned, you know, that she has been
an enabler in many ways for a lot of the bad behavior that
she's engaged in.  She's going through her own therapy.  So
that way, you know, she can be there for him in a positive way
as opposed to the way things were in the past.

As the government noted, the Court's own experts
recognize that Mr. Elliott would benefit from DVT therapy,
cognitive behavioral therapy, things that he's never had the
opportunity to undergo.  Being diagnosed with something is not
the same thing as being diagnosed with the right thing.
Undergoing treatment that is not intended to address the actual
problem is not treatment at all.

This is the first time in his life where he's going to
have the opportunity, with a clear head, for him to go and work
on himself and for him to improve himself, to come out and
demonstrate to all that he can do this, that he can control
himself, that he can operate within the realms of society, that
he can be a productive citizen.

You know, my -- our attorney-client relationship that
we've had has gone up and down at many times, but I probably
know him better than his own family in some ways, and I can

tell you that if we were here a year ago, I couldn't, in reasonable conscience, argue for a sentence of 10 years.

But the person that's sitting here right now is not that same person. It's a person who has like truly, introspectively, had an opportunity to reflect on all the stupidity that has been going on for this number of years, the ridiculous behavior, the ideas that you're going to engage in this these fantastical plans to try and accomplish the worst harms of harms. He knows that that is -- that all that behavior was wrong, that it was egregious, and he is finally, at this point in his life, ready to start a new path, and I merely urge the Court to give him that chance.

THE COURT: Okay. Thank you.

MR. SAMPLE: Thank you, Your Honor.

(Off the record.)

THE COURT: The Court is prepared to state what the sentence will be. And, Counsel, you will each have a final opportunity to state any legal objections before sentence is finally imposed.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Robert Mason Elliott, is hereby committed to the custody of the Bureau of Prisons, to be imprisoned for a term of 520 months. That is 120 months on each of Counts 1, 2, and 15, concurrent to one another, and 400 months on each of Counts 3 and 4, concurrent

to one another, but consecutive to Counts 1, 2, and 15. The
Court finds that this sentence is sufficient, but not greater
than necessary, to achieve the statutory goals of sentencing,
particularly the need to protect the public from further crimes
of the defendant, to promote respect for the law, and impose
just punishment.

The Court makes the following recommendations to the
Bureau of Prisons: The Court will recommend that the defendant
participate in any -- in an appropriate drug abuse program, as
well as a mental and emotional health treatment program as
deemed appropriate.

The defendant shall make restitution to the victims,
Minor Victim 1 and Witness Victim 1, in the amounts of $5,000
each, for a total of $10,000, which shall be paid immediately.
The payment is to be made directly to the clerk of this Court
for disbursement to the victims.

The defendant should notify the United States Attorney
for this district within 30 days of any change in his mailing
or residence that occurs while any portion of the restitution
remains unpaid. Any unpaid restitution balance shall be paid
during the term of supervision at a rate of not less than
10 percent of the defendant's gross monthly income. The
defendant shall notify his probation officer of any material
changes in economic circumstances that might affect his ability
to pay restitution. The Court finds the defendant does not

have the ability to pay restitution, and I'll waive the
restitution requirement.

The Court is not --

(Off the record.)

THE COURT:  And waives the interest requirement.

The Court is not ordering a fine based on the amount
of restitution owed in this case.

The defendant shall forfeit to the United States the
Springfield Model XD9 9mm pistol with a four-inch barrel; the
Glock .23, .40 caliber pistol; a 2008 Hayabusa motorcycle,
H-A-Y-A-B-U-S-A, motorcycle; and all firearms and ammunition
seized on or about June 12, 2019.

The Court is imposing a five-year term of supervised
release on each of Counts 3 and 4, and three years on each of
Counts 1, 2, and 15, to be served concurrently.  This is based
on the nature of the offenses, the defendant's personal history
and characteristics, to protect the public, and assist the
defendant in his reentry into the community.

While on supervised release, the defendant shall not
commit another federal, state, or local crime; he shall
cooperate with the collection of a DNA sample; refrain from any
unlawful use of a controlled substance; submit to one drug test
within 15 days of placement on supervised release and at least
two periodic tests thereafter as directed by his probation
officer.

To promote respect for the law, prevent recidivism, and aid in adequate supervision, the Court intends to order the additional conditions of supervised release that are listed in the Presentence Investigation Report.  And, Mr. Sample, have you reviewed those additional conditions of supervision with your client?

MR. SAMPLE:  We've gone over the whole PSR, Your Honor.

THE COURT:  Do you have any objection to those additional conditions of supervised release?

MR. SAMPLE:  No, Your Honor.

THE COURT:  Since you and your client have reviewed them and you have no objection to any of those conditions, would you waive a formal reading of those conditions into the record?

MR. SAMPLE:  Yes, Your Honor.

THE COURT:  Thank you.

The same questions, Ms. Preston:  Has the government reviewed those additional conditions, does the government have any objection, and will the government also waive a formal reading?

MS. PRESTON:  I have reviewed them, I have no objection, and would waive a formal reading.

THE COURT:  The Court is going to order all these additional conditions of supervised release, Mr. Elliott.  A

majority of these conditions are just administrative
requirements of being on supervised release.  Some of these
conditions will assist your probation officer in monitoring
you, and they are for the protection of the community.  Some of
these conditions are going to address your history of mental
illness and your substance abuse.

The Court is also going to order that you pay the
mandatory special assessment fee of $500, which is also due
immediately.  Payment is to be made directly to the clerk of
this court.

Did you want to talk to your lawyer before I finish?
I see you whispering.  Do you need a minute?

THE DEFENDANT:  Yes.

THE COURT:  Go ahead.

(Off the record.)

THE COURT:  Are you ready, Counsel?

MR. SAMPLE:  Yes, Your Honor.

THE COURT:  Okay.  The sentence that the Court intends
to impose is within the advisory guideline range.  The Court
has examined the 3553(a) factors, including the nature and
circumstances of the offenses, the defendant's extensive
criminal history, his characteristics, the need for the
sentence to reflect the seriousness of these offenses, to
promote respect for the law, provide just punishment, to
provide adequate deterrence to criminal conduct of this nature

by the defendant, as well as others who might try to do similar things, as well as an opportunity to provide the defendant with the much needed mental health and correctional treatment.

The defendant, Robert Elliott, is a 29-year-old man coming before the Court for sentencing for committing a diverse range of criminal activities. As to Counts 1 and 2, murder for hire; and Counts 3 and 4, tampering with a witness victim, the nature and circumstances of these crimes, as well as the relevant conduct associated with these crimes, is extremely serious. Mr. Elliott took substantial steps towards trying to have two people murdered. He came up with three separate plots and, but for the cooperation of these hitmen witnesses, who all became cooperators, he may have been successful.

It is particularly disturbing that he planned to carry out his murder for hire from behind bars. And the target of his murder -- murders for hire were a 16-year-old girl who he once considered to be his girlfriend, and her mother.

Mr. Elliott's conduct is direct evidence of his total disregard for the law and disregard for human life. The defendant's motive for wanting his girlfriend and her mother murdered was to keep them from testifying against him for the battery, obstruction of justice, and invasion of privacy charges that were pending against him on crimes he had committed -- allegedly committed to this girlfriend.

Although the defendant did not plead guilty to several

of the charged counts, he has stipulated to the conduct related to his production and distribution of child pornography involving sexual acts between himself and Minor Victim 1. The defendant was providing Minor Victim 1 with heroin. She reports that she became addicted, which undoubtedly made her more vulnerable given the effects of this highly addictive and horrific drug.

As the Assistant United States Attorney pointed out in her memorandum, Minor Victim 1 appeared to be under the influence of a narcotic drug during some of the sexually explicit videos that Mr. Elliott produced of her. The defendant's conduct, as we've heard from the two victims, will haunt them for the rest of their lives, and it is expected that they will never feel safe from the defendant as all of his conduct was orchestrated from behind bars.

The serious nature of these acts is exhibited by the fact that Counts 3 and 4 alone allow the Court to impose a term of imprisonment of up to 60 years. The guideline computation of 41 is nearly the highest offense level available, which is a level 42. So Congress clearly takes these crimes very seriously.

As it pertains to Count 15, felon in possession of a firearm and ammunition, this offense becomes incredibly more serious than our usual felon in possession of a firearm because of this defendant's history of violence, Mr. Elliott's

possession of a firearm, and threats of violence, based on his criminal history and the nature and circumstances of Counts 1 and 4.

Mr. Elliott is depicted in Facebook images and videos possessing several firearms, including one or more firearms that had a high-capacity magazine. The serial number on the firearm that he pled to had been altered, which is often the case when firearms are meant to be used for criminal acts, in an attempt to prevent tracing those weapons. The search warrant of his residence uncovered in his home, I know it was in his grandfather's room, over 20 firearms, and Defendant had access to all of these weapons. That said, the Court does believe that all of these factors have been taken into account and the guidelines adequately and appropriately address the serious nature of the offenses.

The Court has considered the defendant's criminal history. Mr. Elliott has a violent and troubling criminal history. He has three prior felony convictions and six prior misdemeanor convictions despite his young age. He was 23 when he was incarcerated. By the time he was 23, he had been convicted of domestic violence; battery on his own mother, whom he strangled; trafficking in narcotics; he provided heroin to a minor and tried to provide additional heroin to the minor while he was on pretrial release. He engaged in the straw purchase of a firearm after being convicted of felonies.

He obstructed justice, violated protective orders, engaged in acts of intimidation, sexually exploited a child, and distributed child pornography. He has violated no-contact orders on at least 38 occasions. His convictions for intimidation and invasion of privacy involve violence or threats of violence, including allegations of him pulling a knife on someone and communicating threats of raping, stabbing, and killing his girlfriend, her mother, and others. The need to protect the public from this defendant is very strong.

In assessing the characteristics of the defendant, the Court agrees that Mr. Elliott had a turbulent childhood. He was born into the nonmarital union of his parents, and although he reported to the probation officer, he told us today that he only met his father on three occasions. He reported being beaten by his father, who was an alcoholic, and witnessing domestic violence of his mother by his father.

He was raised by his mother in a single-parent household with the assistance of maternal grandparents. He reports that there were no substance abuse issues in the home. He says he was never abused or neglected at the hands of his family. However, we know that the defendant and his mother -- I'm sorry, the defendant's mother and his grandfather condoned, enabled, and covered up and participated in many of the defendant's deviant and criminal behaviors, so he came from a very dysfunctional family. The defendant's mother was

convicted in state court of conspiring with the defendant to batter, to seriously batter, the victims, as well as conspiracy to obstruct justice.

The defendant told us today that he was sexually molested by a neighbor when he was about five years old. The abuser threatened to kill his mother if he reported the abuse. The defendant eventually did report the abuse to his mother. He told us today that law enforcement was contacted. However, that person was never prosecuted, but the defendant's mother did move away from that neighborhood and that person to protect the defendant from that molester.

The defendant notably, as we've all talked about, did have several opportunities for counseling, and he was in counseling on many occasions. The defendant talked about being in special education classes. His special education was needed because of his attention deficit hyperactivity disorder, but we know that this defendant is very intelligent. We know that from all of the reports, from the letters he's written to the Court, from the recordings that the Court had heard. He's done very sophisticated plots to avoid detection. So he has a very high degree of intelligence despite having been in special education classes. He graduated from high school and attended some college. He's never married and has no children.

Mr. Elliott is a polysubstance abuser. He's abused alcohol and marijuana, beginning when he was a child. He's

experimented with LSD, methamphetamine, and heroin, and abused these substances, as well as prescription drugs.  The defendant is willing to undergo substance abuse treatment while he's serving this sentence.

His physical health is fair.  He did suffer a head injury when he was a teenager, and he's had surgery on his shoulders.  He said that was because he attempted to cut his arms off.

The defendant has a long and extensive history of mental health issues and treatment starting when he was seven years old.  At that time, he reportedly wanted to kill himself because he's been so mean to people, despite not wanting to do so, and that there's something wrong in his head.  So the defendant and his mother recognized very early on that he had some mental health issues.  These ideations and behaviors have seemingly never gone away or otherwise resolved themselves given his history of violence, self-harm, and the nature of these instant offenses.  His violent tendencies cause great concern as the danger he poses to others and the community at large is strong.

He's had numerous hospitalizations after attempting or threatening to commit suicide or harm himself or others.  He's been diagnosed with antisocial personality disorder; borderline personality disorder; other specified personality disorder; narcissistic features; sedative, hypnotic, or anxiolytic use

disorder, moderate in a control environment; and opioid use
disorder, mild in a control environment.

He was evaluated twice by forensic psychologists with
the Bureau of Prisons, and the Court has found, by a
preponderance of the evidence, that Mr. Elliott is not
suffering from a mental disease or defect rendering him
mentally incompetent to the extent that he is unable to
understand the nature and consequences of the proceedings
against him or to assist properly in his defense, and which he
has done so.  He's assisted in his defense.

With respect to the seriousness of the offense, the
need to promote respect for the law, to provide just
punishment, and provide adequate deterrence, as the government
argues, the defendant's offenses are serious.  The victims were
greatly harmed, as we heard from the victims.  The lingering
effects of someone hiring to kill you while incarcerated is
devastating.

Witness Victim 1 reports that her daughter was used
as a punching bag and treated horribly by this defendant.  The
mother continues to suffer physical, mental, and emotional
damage.  The daughter continues to suffer the same things.

Victim 1 reports that the defendant introduced her to
drugs, first prescription drugs, then cocaine, then heroin,
until she was addicted.  He battered Minor Victim 1.
Physically, emotionally, and psychologically, she's been

abused.  She is still in fear of this defendant's actions since he is not deterred by being incarcerated from attempting to cause harm.

The Court has considered the factors presented by the defendant and given them the appropriate weight.  The Court has considered the defendant's expressions of remorse, and I believe he's attempting to be sincere today.  The Court recognizes the defendant's attempts that are detailed in the sealed document.  The Court recognizes and considers Dr. Kim's report and her two-hour evaluation and gives it the appropriate weight.

The Court recognizes that this defendant has long-standing mental health issues, his personality disorder, that he was a victim of sexual abuse, again noting that treatment was provided often.  And it's very unfortunate that it wasn't the appropriate treatment, or maybe there is no treatment, we don't know.

But none of these things diminish or excuse the defendant's conduct.  Mr. Elliott has attempted, at every turn of this case, to thwart law enforcement's efforts to keep the community safe and to prosecute his crimes.  He has exhibited no respect for the law.  He is dangerous, violent, impulsive. He has demonstrated no real likelihood of reform despite numerous incarcerations and admonishments by judges, mental health hospitalizations, and treatment since he was a child.

He admits in his sentencing memorandum that his mental health condition, his personality disorder -- and all of the mental health experts confirm that he understands right from wrong. He is not psychotic, he is responsible for his actions. Mr. Elliott remains a danger to society. There's a strong need to deter him as he's demonstrated an inability to be deterred even while incarcerated.

We know that he's manipulative, and I think that there's some manipulation today in his statements. And the Court believes it's clear that the community must be protected from Mr. Elliott, who has displayed a long-standing disdain for human life, including his own, and for the rule of law. His actions, again, have been manipulative, ruthless, and brazen.

For all of these reasons, the Court determines that a sentence of 520 months is sufficient, but not greater than necessary. So, lawyers, those are the reasons the Court intends to impose the stated sentence. Government, do you know of any reasons, other than those already argued, why sentence should not be imposed as stated?

MS. PRESTON: No, Your Honor.

THE COURT: And, Mr. Sample, do you know of any reasons, other than those already argued, why sentence should not be imposed as stated?

MR. SAMPLE: I do not, Your Honor. I will say that Mr. Elliott has requested a judicial recommendation, and --

THE COURT:  Counsel, we're going to do that in just a minute.

MR. SAMPLE:  Thank you, Your Honor.

THE COURT:  Okay.  The Court is going to impose the sentence as stated.  I'm going to give your client his appellate rights.

Mr. Elliott, you have a right to appeal your conviction if you believe your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceedings that was not waived by your guilty plea.  You also have a right to appeal your sentence if you believe it is contrary to law.

With few exceptions, any notice of appeal must be filed within 14 days after written judgment is entered in your case.  If you cannot afford the filing fee or cannot afford to pay a lawyer to appeal for you, a lawyer would be appointed to represent you in an appeal.  If you intend to appeal, you have to let your lawyer know within 14 days, because Mr. Sample will have to prepare a notice of appeal for you, and he needs to do that within that 14-day window.  Do you understand your appellate rights?

THE DEFENDANT:  Yes.

THE COURT:  Are there any other matters for the government?

MS. PRESTON:  Your Honor, two matters.  Your Honor,

first, the United States moves to dismiss Counts 5 through 14.

THE COURT:  And if you would follow up with a written motion and proposed order, the Court will grant that.

MS. PRESTON:  Absolutely.  Thank you, Your Honor.

And, second, and just simply so that the record is clear, confirming that the Court sentenced Mr. Elliott today on the basis of the reasons given today and the matters you reviewed and indicated you reviewed today, and not based on any *ex parte* under-seal matter.

THE COURT:  That is correct.

MS. PRESTON:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Sample, any other matters?

MR. SAMPLE:  Your Honor, my client is requesting the Court recommend that he go to either FCI Pekin, FCI Petersburg, or --

THE COURT:  Pekin, Illinois?

MR. SAMPLE:  Pekin, Illinois.

THE COURT:  Petersburg in Florida?

THE DEFENDANT:  Where is that?

MR. SAMPLE:  In Virginia.

THE COURT:  Okay.

MR. SAMPLE:  Or Marion, Illinois.

THE COURT:  The Court will make a recommendation that the Bureau of Prisons designate the facility FCI Pekin, Illinois; FCI Petersburg, Illinois --

1    MR. SAMPLE:  Virginia, Your Honor.

2    THE COURT:  Virginia.  I'm sorry -- or Marion --

3    MR. SAMPLE:  Illinois.

4    THE COURT:  -- Illinois.  And the Court is going to

5  make the recommendation that he get the mental health treatment

6  and substance abuse treatment.  Anything else you want me to

7  recommend?

8    MR. SAMPLE:  No, Your Honor.

9    THE COURT:  All right.  Good luck, Mr. Elliott.

10    We are adjourned, and the defendant is remanded to the

11  custody of the United States Marshal.

12    THE COURTROOM DEPUTY:  All rise.

13    (Proceedings adjourned at 11:15 a.m.)

14  -------------------------------------------------------

15                  CERTIFICATE OF COURT REPORTER

16

17     I, David W. Moxley, hereby certify that the

18  foregoing is a true and correct transcript from

19  reported proceedings in the above-entitled matter.

20

21

22  /S/ David W. Moxley_____    January 17, 2023
    DAVID W. MOXLEY, RMR/CRR/CMRS
23  Official Court Reporter
    Southern District of Indiana
24  Indianapolis Division

25